Patrick Mause (AZ Bar No. 024269)
Law Office of Patrick Mause, PLLC
290 North Meyer
Tucson, Arizona 85701
Ph: 520.342.0000
Email: Patrick@PMauseLaw.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| John Wranesh, and individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>Metropolitan Life Insurance Company, a foreign insurance company<br><br>        Defendant. | Case No.:<br><br>**COMPLAINT FOR ERISA DISABILITY AND OTHER BENEFITS** |

For his Complaint, plaintiff John Wranesh alleges as follows:

## Parties, Venue, and Jurisdiction

1.     At all times material hereto, plaintiff John Wranesh was a resident and citizen of Tucson, Arizona.

2.     Upon information and belief, defendant Metropolitan Life Insurance Company ("MetLife") is a New York corporation that is authorized to do business in Pima County, Arizona, and which was doing business in Pima County, Arizona at the times relevant to Wranesh's Complaint.

3.     The Court has jurisdiction over this matter pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA") and 28 U.S.C. § 1331.

4. This case involves Wranesh's claims for long-term disability benefits and associated relief under ERISA. 29 U.S.C. § 1132(a)(1) and § 1132(a)(3).

5. Venue and jurisdiction are proper in this Court pursuant to Rule 65, Fed. R. Civ. P. and ERISA because the harms sought to be remedied occurred in this District, Wranesh obtained the ERISA-governed long-term disability benefits at issue in this case through his work in this District and the plan may be found in this District, and because defendant MetLife may be found in this District.

## Wranesh Becomes Disabled, His Short-Term Disability Claim Is Approved And Paid For Six Months, But MetLife Claims He Is Not Disabled

6. In March 2000, Wranesh was hired by Comcast, a cable television and high-speed internet provider, to work in customer service.

7. In 2018, Wranesh was experiencing worsening medical problems including increasing amounts of pain. He therefore began seeing Dr. Steven Prust, a Tucson pain management physician, who became his attending pain management physician.

8. Despite Dr. Prust's treatment, Wranesh's condition continued to deteriorate over the ensuing months and years.

9. In June 2019, Mr. Wranesh's job at Comcast was Supervisor of Customer Experience, a customer service position.

10. By June 2019, Mr. Wranesh's medical conditions prevented him from performing the material duties of his occupation. Wranesh was therefore forced to stop work on June 9, 2019.

11. Because Comcast maintained short-term disability ("STD") plan for its employees, in addition to the long-term disability ("LTD") plan at issue here, Wranesh applied for STD benefits.

12. Unlike the MetLife LTD benefits at issue here, Comcast's STD plan is self-funded by Comcast; meaning Comcast pays STD benefits out of its own funds.

13. The MetLife LTD plan which insured Wranesh, by contrast, is fully-insured; meaning MetLife charges and accepts premiums in exchange for its promises to provide disabled employees with LTD benefits. MetLife is also responsible for paying any LTD benefits it finds are due and owing. This "dual role" as payor and decider of LTD claims creates an inherent financial conflict of interest for MetLife because the more claims it approves, the more claims it must pay, and the lower its potential profitability.

14. While Comcast "self-insures" its STD plan, it does not administer claims under that plan. Instead, Comcast relies upon a third-party administrator known as Sedgwick CMS to administer and decide STD claims.

15. Because Mr. Wranesh became disabled when he was forced to stop work on June 19, 2019 due to his disabling medical conditions, he applied for STD benefits with Sedgwick.

16. Sedgwick reviewed Mr. Wranesh's STD claim, evaluated whether he was disabled and precluded from performing the material duties of his own occupation, determined that he was totally disabled under the STD plan, and approved his claim.

17. Under Comcast's self-insured and Sedgwick-administered STD plan, Wranesh was eligible to receive up to a maximum of 180 days of STD benefits.

18. During the administration of his STD claim, Sedgwick periodically reviewed his claim to determine whether Wranesh remained disabled.

19. Based on its reviews of Wranesh's disability, Sedgwick approved and paid his STD claim, and eventually paid him through the maximum, 180-day STD benefit eligibility period.

20. In November 2019, as Wranesh was approaching the maximum eligibility for STD benefits, he contacted MetLife to submit a claim for LTD benefits. Wranesh thereafter provided MetLife with numerous documents showing his disability and entitlement to ongoing disability benefits.

21. As part of his LTD application materials, Wranesh provided MetLife with forms and information from Dr. Prust, including a December 27, 2019 form in which Dr. Prust documented his findings that Wranesh suffered "Significant chronic pain and generalized weakness"; that Wranesh's impairments "substantially limit[ed]" numerous work-related activities including working, bending, concentrating, lifting, performing manual tasks, reaching, reading, standing, and walking." In that form, Dr. Prust further indicated that he had reviewed Wranesh's job description and that Wranesh's "impairment limit[ed] his/her ability to do any of the job functions for the position and/or create[d] a direct threat to the safety/health of the employee or others if he/she performs such functions."

22. In connection with his LTD application, Wranesh also provided MetLife with multiple medical records from Dr. Prust which documented Wranesh's ongoing pain and limitations and documented Dr. Prust's clinical findings relating to Wranesh's pain and limitations.

23. In connection with his LTD application, Wranesh also provided MetLife with imaging reports noting his objectively-documented physical problems such as "Severe bilateral foraminal stenosis" in his neck; "Moderate to advanced degenerative lumbar spondylosis" in his lower back; and medical records noting that his March 2019 brain MRI documented "some encephalomalacia over the right cerebellum."

24. In connection with his LTD application, Wranesh also provided MetLife with medical records from consulting neurologists who documented his

severe pain, noted that some of his pain may also be due to fibromyalgia, and advised him to continue treatment with his pain management physician.

25. In connection with his LTD application, Wranesh also provided MetLife with information about his prescription medications. These prescriptions included numerous heavy-duty medications known to have severe, impairing side effects; including carbamazepine, duloxetine, gabapentin, meloxicam, and tramadol.

26. As part of its review, MetLife sent Wranesh's claim to "Genex," a for-profit company that arranges so-called "independent" medical reviews for the disability insurance industry.

27. Upon information and belief, MetLife has a longstanding and highly profitable relationship with Genex and counts on Genex to obtain and provide biased but allegedly "independent" medical reviews to MetLife to use to deny or terminate LTD benefits. *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016) ("Mr. Demer has offered evidence that the IPCs have earned a substantial amount of money from MetLife ($125,000–$175,000 each year) and have performed a substantial number of reviews for the company as well (200–300 reviews/addendums each year). The magnitudes of these numbers, particularly when combined, raise a fair inference that there is a financial conflict which influenced the IPCs' assessments, and thus such conflict should be considered as a factor in reviewing MetLife's decision for abuse of discretion.").

28. Genex, in turn, referred Wranesh's claim to two physicians who, upon information and belief, have longstanding histories of providing biased, outcome-focused medical reviews for the disability insurance industry, Dr. Jonathan Marehbian and Dr. David Burke. *See Demer, supra*.

29. Dr. Marehbian is not licensed to practice medicine in Arizona.

30. Dr. Marehbian never examined Wranesh.

31. Upon information and belief, Dr. Marehbian has a consistent history of conducting biased, outcome-focused medical reviews for the insurance industry. *See Demer, supra.*

32. Upon information and belief, discovery will show that Genex and Dr. Marehbian are "bought and paid for" and their opinions about insureds' disabilities are effectively pre-ordained to claim the insured is not disabled.

33. As expected, Dr. Marehbian conducted a biased, outcome-focused review of Wranesh's claim.

34. Among other things, as part of his review Dr. Mahrebian acknowledged Dr. Prust's clinical findings, acknowledged that Dr. Prust had placed limitations on Wranesh due to his persistent and refractory pain, but summarily rejected Dr. Prust's findings by claiming "there is no documented clinical findings to concur with the reported symptoms [sic]." This statement is false, contrary to the medical evidence, and is evidence of Dr. Marhebian's, and therefore also Genex's and MetLife's, financially motivated biases and prejudices. *See Demer, supra.*

35. On February 19, 2020, Dr. Mahrebian completed an "Addendum" to his review which addressed additional medical information confirming Wranesh's disability. As Dr. Mahrebian conceded, Dr. Prust's examination findings included that Wranesh "persists with lumbar back pain and radicular component of the pain involving the left lower extremity. Examination at the time revealed +SLR [straight leg raise test], diffuse tenderness, and altered sensation involving L5 distribution." Based on this, Dr. Mahrebian opined that *some* restrictions were warranted, but nevertheless effectively said Wranesh was capable of full-time work. *See Demer*, *supra.*

36. In his addendum, Dr. Mahrebian also conceded that Wranesh' medical evidence "is suggestive for radiculopathy" based on "clinical findings of

6

+SLR [straight leg raise test] and altered sensorium in an L5 distribution." While Dr. Mahrebian claimed there was also "no confirmatory imaging work-up" that is incorrect. Wranesh's lumbar (and cervical) MRI shows multilevel spinal dysfunction, including "mild right and moderate left foraminal narrowing" at L4-5 and "moderate/severe bilateral foraminal narrowing" at L5-S1. *See Demer, supra.*

37. Upon information and belief, Dr. Mahrebian rarely, if ever, has changed a "not disabled" opinion to "is disabled" in an addendum reviewing further medical evidence of disability. *See Demer, supra; see also Hertz v. v. Hartford Life & Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1136 (D. Nev. 2014) ("Accordingly, MLS found that approximately 95% of all claimants could perform some type of work. During that same time frame, Dr. Rim reviewed fourteen (14) claims for Hartford. Significantly, of those fourteen (14) claims reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work. Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work. The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work." (record citations omitted)).

38. Like Dr. Mahrebian, Dr. Burke is not licensed to practice medicine in Arizona.

39. Like Dr. Mahrebian, Dr. Burke never examined Wranesh.

40. Upon information and belief, Dr. Burke also has a consistent history of conducting biased, outcome-focused medical reviews for the insurance industry. *See Demer, supra.*

41. Like Dr. Mahrebian, Dr. Burke confessed that Wranesh had legitimate medical conditions that imposed some restrictions upon his ability to work. And like Dr. Mahrebian, Dr. Burke reached the effectively pre-ordained

1  opinion that Wranesh could nevertheless work full time; notwithstanding his
2  conceded, painful medical conditions. *See Demer, supra.*

3  42. In their reviews, both Dr. Mahrebian and Dr. Burke acknowledged
4  the medical evidence confirming Wranesh's disability but then improperly
5  rejected that evidence.

6  43. MetLife's and its employees' and consultants' reviews of Wranesh's
7  LTD claim were plagued with "procedural irregularities" such as cherry-picking
8  the medical evidence, ignoring relevant findings, discounting relevant findings,
9  improperly rejecting the findings of Wranesh's attending physicians,
10 misconstruing the medical records and medical evidence, and effectively
11 claiming Dr. Prust's records did not indicate what Dr. Prust said they indicated
12 and intended them to indicate. *See e.g. Abatie v. Alta Health & Life Ins. Co.*, 458
13 F.3d 955, 972 (9th Cir. 2006).

14 44. Based on Dr. Marhebian's and Dr. Burke's biased and outcome-
15 focused medical reviews, without attempting to reconcile its "not disabled"
16 theory with Sedgwick's approval of Wranesh's STD claim through the maximum
17 180-day duration, and without giving any weight to the findings of Wranesh's
18 attending physicians, MetLife denied Wranesh's LTD claim.

### **Wranesh Appeals MetLife's Denial**

20 45. On December 7, 2020, Wranesh timely appealed MetLife's decision
21 denying his LTD benefits.

22 46. With his appeal, Wranesh submitted extensive information
23 confirming his ongoing disability, including:

24     A. The report of a September 22, 2020 Functional Capacity
25         Evaluation ("FCE") that found, among other things:
26         i. "Based on the results of the FCE, he [Wranesh] does not
27           demonstrate the functional capacity to perform his past

28

       work as a First-Line Supervisor for Comcast or any other work including all types of SEDENTARY physical demand work per the Dictionary of Occupational Titles definition on a regular and consistent basis, i.e., fulltime."

  ii. "The physical impairments that prevent him from being able to perform his past work or ANY other work include impaired stamina and endurance as well as impaired physical tolerance for sitting, standing/walking, bending at the waist, squatting, kneeling, climbing steps, and ladders."

  iii. "These limitations are related to pain and neuropathic symptoms related to his multilevel spinal stenosis, lumbar radiculopathy, and other symptoms related to the above-listed health conditions."

B. A November 27, 2020 letter from his attending pain management physician, Dr. Steven Prust, expressing his findings that, among other things:

  i. "I strongly disagree with the denial of his long-term disability, and this letter is to serve as a rebuttal to multiple points made in reports."

  ii. Dr. Prust began treating Wranesh in November 2018, and his "condition deteriorated in 2019, and his pain worsened."

  iii. Wranesh's "current diagnoses include but are not limited to fibromyalgia, post-herpetic neuralgia, cervical radiculopathy, lumbar radiculopathy, myofascial pain, and multiple joint pain."

      iv. "Based on my clinical findings, there are multiple restrictions placed upon Mr. Wranesh. Due to his conditions, he has to frequently alternate between sitting and standing. He also cannot focus both due to his chronic pain but also due to his neurological conditions. He would be required to miss multiple days in a month due to his medical conditions."

      v. "Mr. Goldstein's FCE is the most thorough battery of tests and examinations that Mr. Wranesh has undergone, including my own FCE evaluations. Given the extensive examination that was done and the results of the FCE, I agree with Mr. Goldstein and his conclusions, including that Mr. Wranesh does not have the functional capacity to perform his past work or any other work."

      vi. "In regards to malingering or secondary gain, I have not witnessed either behavior with Mr. Wranesh since I have known him. He does not exhibit Waddell's signs, and his findings are consistent. As well, Mr. Wranesh has demonstrated a strong desire to get better and return to work. Unfortunately, his condition has not allowed this to happen."

      vii. "In summary, I strongly support Mr. Wranesh's claim for long term disability. All of my opinions and thoughts expressed in this letter are to a reasonable degree of medical probability."

C. Medical records from Dr. Prust showing Wranesh's ongoing symptomatology and deficits, including records showing:

    i. Wranesh had decreased sensation on the left C8 dermatome consistent with cervical radiculopathy;

    ii. Positive straight leg raise test on the left consistent with lumbar radiculopathy;

    iii. Positive 12/18 fibromyalgia tender points consistent with a diagnosis of fibromyalgia syndrome;

    iv. 1/4 left bicep reflex and trace left tricep reflex consistent with cervical radiculopathy;

    v. 1+/4 right Achilles reflex consistent with lumbar radiculopathy;

    vi. 4/5 left hip flexion, adduction, and knee flexion strength consistent with strength deficits due to lumbar radiculopathy;

    vii. 4+/5 left extensor hallucis longus (EHL) and left dorsiflexion strength, and 3+/5 left plantar flexion consistent with lumbar radiculopathy;

    viii. 4+/5 left grip, left interossei, wrist flexion, and should abduction strength, and 4/5 left elbow flexion and shoulder extension strength consistent with cervical radiculopathy;

    ix. Reduced cervical and lumbar range of motion consistent with cervical and lumbar degenerative changes and stenosis;

    x. Decreased sensation in the V1, V2, and V3 distributions consistent with trigeminal neuralgia; and

       xi.  Antalgic gait consistent with lumbar radiculopathy and loss of strength and sensation secondary to lumbar radiculopathy.

   D.  Radiology images showing multi-level cervical and lumbar degeneration, foraminal narrowing, and stenosis; and a brain MRI showing a chronic infarct in his right cerebellar hemisphere.

47. With his appeal letter, Wranesh also asked MetLife to respond to numerous questions and requests for information to enable him to evaluate the fairness of its prior decisions and reviews, and the fairness of any subsequent reviews. Wranesh based his questions upon the issues specifically identified by the 9th Circuit in the *Demer* case, which was a case in which MetLife's and its consultants' financial conflicts of interest were found to have likely infected and influenced the claim process. *See Demer*, *supra*.

48. By letter dated December 17, 2020, and despite *Demer's* directives against MetLife, MetLife acknowledged Wranesh's appeal but refused to provide any information in response to Wranesh's requests. Wranesh specifically notes that he requests discovery to illuminate the issues raised in the questions included in his appeal letter to MetLife and other issues as may be appropriate in this litigation.

## **MetLife Fails To Decide Wranesh's Appeal, Wranesh Is "Deemed To Have Exhausted" His Administrative Remedies," He Is Entitled To File Suit, And He Is Entitled To *De Novo* Review Of His Claim.**

49. Under ERISA, disability claim administrators like MetLife have 45 days to decide appeals. If "special circumstances" exist, disability claim administrators may take an additional 45 day period to decide an appeal. 29 C.F.R. § 2560.503-1(i)(3)(i).

50. MetLife's initial 45-day deadline to decide Wranesh's appeal expired on January 22, 2021.

51. MetLife never requested an additional 45 days to decide Wranesh's appeal.

52. Even if MetLife had requested an additional 45 days to decide Wranesh's appeal, that deadline would have expired on March 8, 2021.

53. MetLife has failed to make a timely decision on Wranesh's appeal.

54. Because MetLife has failed to decide Wranesh's appeal within the deadlines prescribed by ERISA, Wranesh is "deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act," i.e. 29 U.S.C. § 1132(a)(1). *See* 29 C.F.R. 2560.503-1(l)(2); *see also Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1299 (9th Cir. 2014).

55. Additionally, because MetLife has failed to make a decision on Wranesh's appeal, Wranesh is entitled to *de novo* review of his claim. *See* 29 C.F.R. § 2560.503-1(l)(2)(i) ("If a claimant chooses to pursue remedies under section 502(a) of the Act under such [deemed exhausted] circumstances], the claim or appeal is deemed denied on review without the exercise of discretion by an appropriate fiduciary."); *accord Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1103 (9th Cir. 2003) ("where, according to plan and regulatory language, a claim is 'deemed… denied' on review after the expiration of a given time period, there is no opportunity for the exercise of discretion and the denial is usually to be reviewed *de novo*."). In other words, even if the LTD plan allegedly grants MetLife "discretion" to determine entitlement to benefits, because of MetLife's wholesale violation of its ERISA obligations, the "abuse of discretion" standard of review cannot apply to Wranesh's claim. *Id*.

13

## **Count One: Claim For Benefits Under ERISA, 29 U.S.C. § 1132(a)(1)**

56. Wranesh incorporates the preceding allegations as though fully set forth herein.

57. As recognized by Sedgwick, Wranesh was disabled throughout the LTD plan's "elimination period," which is the roughly 180 day period following disability during which benefits are not payable.

58. Wranesh was and remains disabled as defined by the LTD plan.

59. Wranesh has been damaged by MetLife's wrongful denial of his LTD claim.

60. Wranesh is entitled to ongoing LTD benefits under the plan.

61. Wranesh is entitled to a declaration that he remains disabled under the plan.

62. At all times material hereto, MetLife, Genex, Dr. Mahrebian, and Dr. Burke were influenced by their financial conflicts of interest. These conflicts of interest infected the claims process and deprived Wranesh of the full and fair review to which he is entitled under ERISA. *See Demer, supra.*

63. Under *Demer*, Wranesh is entitled to discovery to assess the manner and extent to which MetLife's, Genex's, Dr. Mahrebian's, and Dr. Burke's financial conflicts of interest infected the claims process and deprived Wranesh of the full and fair review to which he is entitled under ERISA. *See Demer, supra.*

64. Discovery is warranted and necessary, even under the *de novo* standard of review, to expose MetLife's, its employees', and its allegedly independent consultants' financial conflicts of interest and biases and the manners in which those conflicts and biases infected the claim process, influenced or affected the actions of MetLife and its employees and consultants, and deprived Wranesh of the full and fair review to which he is entitled. *Demer*, 835 F.3d at 901–02 ("Mr. Demer's argument here is comparable to conventional

approaches to discrediting the testimony of retained experts whose objectivity may be challenged based on, *e.g.*, the number of times he or she has served as an expert in support of a party and the amount of compensation received…"); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1011 (9th Cir. 2004) ("Evidence was also presented that Defendants exhibited bias in selecting and retaining Dr. Swartz as the IME. Paul Revere used Dr. Swartz nineteen times from 1995 to 2000… evidence showed that in thirteen out of thirteen cases involving claims for total disability, Dr. Swartz rejected the insured's claim that he or she was totally disabled."); *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) ("introduction of evidence beyond the administrative record could be considered necessary [in] claims that require consideration of complex medical questions or issues regarding the credibility of medical experts… instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (citation omitted)); *Hertz v. v. Hartford Life & Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1136 (D. Nev. 2014) ("Dr. Rim did not find that a single claimant was completely unable to perform any type of work. Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work. The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work." (docket citation omitted)); *Watson v. Metro. Life Ins. Co.*, No. CV-11-01393-PHX-GMS, 2012 WL 5464986, at *9 (D. Ariz. Nov. 8, 2012) ("This proceeding is a trial on the administrative record, and Watson's allegations go to the weight that the Court should assign the evidence and conclusions of the MetLife consultants. If all of these issues would be relevant in an abuse of discretion case, they are just as relevant in a de novo case.").

65. Upon information and belief, MetLife, Genex, Dr. Mahrebian, and Dr. Burke have a biased and parsimonious claims history.

66. Pursuant to ERISA, Wranesh is entitled to take discovery, introduce evidence, and have a bench trial regarding, among other things, the biases and credibility of the medical and vocational personnel MetLife relied upon to deny his LTD claim and the effects of their and MetLife's inherent financial conflicts of interest on the decision denying his claim and violating its obligation to timely decide Wranesh's appeal. *See Demer, Opeta, Watson, supra; see also Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) ("Instead, without evidentiary hearing or bench trial, the district court considered and rejected Nolan's bias argument by weighing the documentary evidence of bias, and ignoring the protections that summary judgment usually affords the non-moving party. Though the district court would have been permitted to weigh such evidence after bench trial, weighing that evidence on summary judgment was improper in this case where the evidence was outside of the administrative record."); *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 930 (9th Cir. 2012) (traditional summary judgment standards applies to the ERISA conflict of interest analysis and if district courts cannot resolve the conflicts' effects under Rule 56, the insured is entitled a bench trial including a "'full bias inquiry' necessary to determine what weight to give a conflict of interest"); *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) ("Evidence is essential if the court is to fulfill its fact-finding function. Just so in ERISA litigation. When review is deferential—when the plan's decision must be sustained unless arbitrary and capricious—*then* review is limited to the administrative record… Otherwise, however, the court decides on the record made in the litigation. And, if material evidence conflicts, then there must be a trial.").

67. Wranesh has been injured by the wrongful denial of his LTD claim.

68. Under the *de novo* standard of review, Wranesh is disabled and entitled to past and future LTD benefits.

69. Even under the abuse of discretion standard of review, Wranesh is entitled to past and future LTD benefits because MetLife's decision denying his LTD claim was arbitrary and capricious, unsupported by a reasonable basis, and the product of its and its retained consultants' and employees' financial conflicts of interest.

70. Pursuant to ERISA, 29 U.S.C. § 1132(a)(1) and § 1132(g), Wranesh is entitled to recover unpaid disability benefits, prejudgment interest at the maximum allowable legal or equitable rate, and his reasonable attorney's fees and costs of filing suit.

71. Pursuant to ERISA, 29 U.S.C. § 1132(a)(1), Wranesh is also entitled to a declaration that he is entitled to ongoing LTD benefits until such time as a reasonable, non-biased, non-bought-and-paid for physician would conclude that he had recovered to such an extent that he had become able to sustain full-time work on an ongoing and consistent basis, and without undue interruption, in a stressful and competitive work environment. *See Gorena v. Aetna Life Ins. Co.*, No. C17-532 MJP, 2018 WL 3008873, at *7 (W.D. Wash. June 15, 2018) ("Subject to the terms and conditions of the Plan, Defendant is directed to pay her LTD claim to the policy's maximum benefit duration absent a showing of improvement in her medical condition such that a reasonable physician would conclude that she could work in 'any gainful activity for which she is, or may reasonably become, fitted by education, training, or experience and which results in, or can be expected to result in, an income of more than 60% of her adjusted predisability earnings.' Unless Defendant can establish that Plaintiff is capable of performing such work productively, full-time, and without undue disruptions and/or absences due to her MS and its related symptoms, she is to continue to receive LTD benefits to the Plan's maximum duration." (brackets and internal reference omitted)); *accord Medefesser v. Metro. Life Ins. Co.*, No. 6:18-CV-00041-MK, 2019

WL 6481794, at *12 (D. Or. Sept. 5, 2019), *report and recommendation adopted,* No. 6:18-CV-00041-MK, 2019 WL 6467818 (D. Or. Dec. 2, 2019).

72. With respect to pre- and post-judgment interest, under ERISA, 29 U.S.C. § 1132(a)(3), Wranesh demands equitable relief such that pre- and post-judgment interest be assessed at the maximum allowable rate but at a rate no lower than the maximum rate at which MetLife earned interest, return on equity, return on interest, or otherwise profited or benefited from its wrongfully denying Wranesh's LTD claim and wrongfully withholding his LTD benefits.

WHEREFORE, plaintiff John Wranesh prays for judgment as follows:

A. For long-term disability benefits under his LTD plan and/or an order enforcing his right to LTD benefits under the plan;

B. For any other ERISA plan benefits to which he may be entitled due to his disability, such as a waiver of premiums under any relevant life insurance plan;

C. For prejudgment interest at the maximum allowable interest rate until paid, but in no event at a rate lower than the highest rate at which MetLife earned interest, return on equity, return on interest, or otherwise financially benefited or profited from the non-payment of his LTD claim;

D. For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. § 1132(g); and

E. For any other legal or equitable relief as may be just and proper, including under 29 U.S.C. § 1132(a)(3).

DATED March 25, 2021.

LAW OFFICE OF PATRICK MAUSE, PLLC

*/s/ Patrick W. Mause*
Patrick W. Mause
290 North Meyer Ave.
Tucson, AZ 85701

*Attorneys for Plaintiff*